UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER A. CLAYWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:14-cv-00205-SEB-MJD |
| | ) | |
| CAROLYN W. COLVIN Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Christopher Claywell ("Plaintiff" or "Claywell") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") denying his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). *See* 42 U.S.C. §§ 416(i), 423(d). For the reasons set forth below, the Magistrate Judge recommends that the decision of the Commissioner be **AFFIRMED**.

## Procedural History

Claywell filed an application for DIB in June 2011 alleging an onset of disability on April 10, 2010. Claywell's application was denied initially on September 19, 2011 and on reconsideration on November 7, 2011. Claywell requested a hearing, which occurred via video conference before Administrative Law Judge ("ALJ") Julia D. Gibbs on September 11, 2012. The ALJ concluded Plaintiff was not disabled at any time from his alleged onset date through the date of the ALJ's September 28, 2012 decision. The Appeals Council denied Claywell's request

for review on December 18, 2013, rendering the ALJ's decision final. Claywell filed his Complaint with this Court on February 12, 2014.

## Factual Background and Medical History

Plaintiff was 47 years old and had a high school education at the time of the ALJ's decision. [R. at 19.] He had work experience as a setup man, assembler, and sales clerk, [*id.*], but left his last job after his employer went out of business in 2009. [R. at 31.] He began collecting unemployment benefits, [*id.*], and obtained an associate degree in medical assisting in May 2012. [R. at 33.] Two weeks prior to the hearing before the ALJ, Plaintiff began working at an auto parts store. [R. at 30-31.]

Plaintiff alleges a disability onset date of April 10, 2010. [R. at 11.] Plaintiff's primary care physician both before and after this time was Dr. Marc Davisson. [R. at 16.] The earliest medical evidence in the record is from 1999 and shows Plaintiff had a history of sleep apnea, hypertension, and atrial fibrillation. [R. at 340.] Records from Dr. Davisson's office, however, indicate that these problems were well-controlled by 2008. [*See, e.g.*, R. at 444-45.]

The record contains no significant records from the months before or after the alleged onset of disability in April 2010. [R. at 16; *see also* Dkt. 16 at 2-3.] In November 2010, Plaintiff saw Dr. Davisson for a "[p]reventative checkup." [R. at 227.] He noted Plaintiff's history of atrial fibrillation, hypertension, and sleep apnea, [R. at 226], but did not describe any particular complaints or symptoms. [R. at 226-27.]

In June 2011, Dr. Davisson conducted a follow-up examination and diagnosed depression, osteoarthritis, and asthma in addition to Plaintiff's previously diagnosed conditions. [R. at 228.] Plaintiff complained of wheezing, back pain, and joint pain. [R. at 243-44.] Dr. Davisson prescribed medication and ordered a follow-up in six months. [R. at 229.] Two weeks

later, Plaintiff returned with complaints of paroxysm, but by the time he saw Dr. Davisson, his heart rate and rhythm were regular. [R. 247.]

In 2011, Plaintiff also saw Dr. Davisson with complaints of poor circulation in his right foot. [R. at 250.] An ultrasound, however, revealed no occlusion, no significant stenosis, and no plaque. [*Id.*]

On August 23, 2011, Dr. Victoria Martin performed a medical consultative examination. [R. at 273-76.] Plaintiff reported fatigue, anxiety, depression, sleep disturbance, weakness, back pain, joint pain, wheezing, and shortness of breath. [R. at 274.] Dr. Martin noted Plaintiff's history of knee pain, depression, sleep apnea, obesity, and atrial fibrillation. [R. at 273-74.] Plaintiff reported that he could not "stand or walk very far," but said he was "going to school for medical assisting" and was "taking classes to get unemployment." [R. at 273.] Dr. Martin observed no difficulty while ambulating and no obvious fatigue or shortness of breath. [R. at 275.] Plaintiff could not fully squat and had an abnormal gait because of the size of his thighs, but his range of motion was "essentially within normal limits with the exception of [decreased] lumbar flexion." [*Id.*] His muscle strength, sensation, grip strength, and motor control were normal. [*Id.*] Dr. Martin ordered a pulmonary function test, but the administrator noted Plaintiff did not exert maximal effort, and the test produced "0 good results." [R. at 280.] Dr. Martin concluded that the patient "would have difficulty working" due to his "morbid obesity and knee pain," and that it would be "hard for him to walk 2 hours in a given 8-hour shift." [R. at 275-76.]

State agency physician Dr. J.V. Corcocan reviewed the record on September 16, 2011. [R. at 308-15.] He determined Plaintiff could occasionally lift and carry up to 20 pounds, frequently lift and carry up to 10 pounds, stand and/or walk for 6 hours in an 8-hour day, and sit for 6 hours in an 8-hour day. [R. at 309.] He cited Dr. Martin's examination to support his

conclusions. [*Id.*] State agency physician Dr. J. Sands reviewed the record and affirmed Dr. Corcocan's assessment on November 5, 2011. [R. 330.]

On August 24, 2011, Plaintiff underwent a psychological consultative examination performed by Dr. Kenneth McCoy. [R. at 283.] Plaintiff reported that he had never received inpatient psychiatric care or counseling, but had received outpatient psychiatric care from his internist. [*Id.*] He reported "depression and anxiety" accompanied by confusion and worrying, [*id.*], and said he had experienced difficulty "getting along with others for the past 5 to 10 years." [R. at 285.] He stated he had thoughts of self-harm, but had no history of suicide attempts or plans to harm himself. [R. at 283.] Plaintiff was cooperative and had "average" or "low average" verbal abilities and memory. [*Id.*] Dr. McCoy assigned a Global Assessment of Functioning (GAF) score of 55, corresponding to "moderate symptoms" or "moderate difficulties in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." [R. at 17, 286.] He concluded that Plaintiff would "probably struggle in a work environment due to chronic pain and associated irritability and difficulty interacting with others." [R. at 285.]

State agency psychologist Dr. Kari Kennedy reviewed the record on September 12, 2011. [R. at 304.] She concluded Plaintiff could understand, carryout, and remember simple instructions; make judgments appropriate to unskilled work; respond appropriately to coworkers and work situations; and deal with changes in a routine work setting. [*Id.*] She found that Plaintiff was only partially credible and noted that his reports of not getting along with co-workers were not consistent with his history of employment. [*Id.*] She also suggested that his lack of treatment for mental impairments indicated the impairments were not as severe as he alleged. [*Id.*] State agency psychologist Dr. William Shipley affirmed Kennedy's assessment. [R. at 329.]

On October 7, 2011, Plaintiff began psychological counseling at Meridian Services mental health clinic. [R. at 334.] His case coordinator identified his problems as "major depression" and "generalized anxiety disorder." [*Id.*] She assigned a GAF score of 35, [*id.*], corresponding to "some impairments in reality testing or communication," such as illogical or irrelevant speech, or "major impairments in several areas, such as work or school, family relations, judgment, thinking, or mood." [Dkt. 16 at 8 n.2.] Plaintiff's mood was "depressed and anxious," and he reported depression about "being laid off work and having to be retrained in a new field." [R. at 335.] He also reported that he became angry easily, did not enjoy being around people, and had "anxiety with family life and 13 year old son." [R. at 374, 379.] Plaintiff did not trust other people, [R. at 383], but could "go out to social events," such as car shows or visits to the zoo. [R. at 374.] Plaintiff also had a "linear" and "logical" thought process, [R. at 335], and his counselor noted that he was enrolled in vocational school. [R. at 374.]

Plaintiff returned for counseling sessions on October 21, 2011, [R. at 381], and November 4, 2011. [R. at 384.] The counselor focused on helping Plaintiff assess "his true hopes and goals" and "assess their feasibility," [R. at 386], but Plaintiff did not return for further counseling. [R. at 387.]

Plaintiff next saw Dr. Davisson on December 16, 2011 for a 6-month "recheck" of his conditions. [R. at 446.] The doctor noted Plaintiff's previously diagnosed hypertension, depression, osteoarthritis, atrial fibrillation, sleep apnea, and asthma. [*Id.*] He reported that the hypertension was benign, that the asthma and atrial fibrillation were "controlled" with medication, and that Plaintiff appeared "rested" despite the sleep apnea. [*Id.* at 446-47.] Plaintiff had a "blunted affect," and Dr. Davisson continued Plaintiff on Cymbalta and Valium to manage

his depression. [R. at 447-48.] Plaintiff reported back pain, but his musculature and range of motion were normal. [R. at 448.]

In June 2012, Plaintiff returned to Dr. Davisson for a routine medical exam. [R. at 453.] Dr. Davisson again noted the previously described diagnoses and reviewed Plaintiff's medications. [R. at 453-54.] He reported that the sleep apnea was "controlled" and the osteoarthritis was under "fair control," but that Plaintiff still had back and joint pain. [R. at 454-55.] Plaintiff's musculature and range of motion remained normal, and he had "[n]o unusual anxiety or evidence of depression." [R. at 456.]

On August 13, 2012, Dr. Davisson completed a form prepared by Plaintiff's attorney. [R. at 416.] He listed Plaintiff's diagnoses as sleep apnea, atrial fibrillation, hypertension, asthma, depression, osteoarthritis, and obesity. [*Id.*] Plaintiff's prognosis was "fair," and Dr. Davisson stated that the "sustainability of an [8-hour] work day" was "moderated by [Plaintiff's] obesity, arthritis, fatigue, and motivation." [*Id.*] He added that Plaintiff "occasionally" needed a cane to ambulate. [*Id.*]

The ALJ conducted a hearing on September 11, 2012. [R. at 26.] Plaintiff testified that he had been working at an auto parts store for two weeks, [R. at 30], but reported difficulty lifting parts, using the computer to look up information, and accurately counting change. [R. at 31.] He confirmed that he obtained a degree for medical assisting in May 2012, but expressed doubt about working as a medical assistant because of a lack of computer skills. [R. at 33-34.]

Plaintiff testified that he had difficulties with his sleep apnea and atrial fibrillation, and that he would often lie down for three to four hours per day. [R. at 35.] He testified that he was not allowed to do so while working at the auto parts store, and that this prolonged standing

caused knee and back pain, [R. at 35-36], but he was able to work six days each week without missing any time. [R. at 42.]

On questioning by his attorney, Plaintiff testified that he had problems with anxiety and depression, had crying spells, and had trouble dealing with people. [R. at 40.] On questioning by the ALJ, he reported that his job at the auto parts store required selling to the public, both in person and over the phone. [R. at 42.] Doing so caused stress because people would "get on [his] nerves." [R. at 43.]

Plaintiff further testified that he could stand for five to ten minutes; that he could sit for thirty minutes; that he could walk for twenty or thirty feet; and that he could lift five pounds without difficulty. [R. at 43-44.] He noted, however, that he had been standing for longer periods and lifting heavier objects while at the auto parts store. [R. at 44.]

Vocational expert Ray Burger then testified. The ALJ asked whether the Plaintiff would be able to perform sedentary work if given a "sit/stand option every 45 minutes" and if not required to climb ladders, ropes, or stairs. [R. at 46.] The ALJ stated that with such limitations, Plaintiff could perform work as a cashier, hand bench worker, or hand packager. [R. at 47.] He later added that Plaintiff could perform these jobs even if he needed to "avoid face to face interaction with the general public." [R. at 48.]

Plaintiff's attorney then asked whether that work would be available if the Plaintiff were required to miss two to three days per month, or if Plaintiff had more severe limitations on his ability to stand and walk. [R. at 47.] The vocational expert stated such restrictions would preclude Plaintiff from the jobs he had previously identified. [*Id.*] Finally, Plaintiff's attorney requested a supplemental hearing to obtain testimony from a medical expert on whether

Plaintiff's combined impairments medically equaled a Listing. [R. at 48.] In her decision, the ALJ denied this request. [R. at 11.]

<h2 align="center"><u>Applicable Standard</u></h2>

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423.[1] Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. §

---

[1] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

404.1520(f). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* This court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must articulate her analysis of the evidence in her decision; she "is not required to address every piece of evidence or testimony," but must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176.

### The ALJ's Decision

The ALJ first determined that Claywell met the insured status requirements of the Social Security Act through December 31, 2014. [R. at 13.] Applying the five-step analysis, the ALJ found at step one that Claywell had not engaged in substantial gainful activity since April 10, 2010, the alleged onset date. [*Id.*] At step two, the ALJ found that Claywell had the following "severe" impairments: obesity, obstructive sleep apnea, polycythemia, hypertension, atrial fibrillation, asthma, and osteoarthritis. [*Id.*] At step three, the ALJ found that Claywell did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment in the Listing of Impairments. [R. at 15.]

After step three but before step four, the ALJ found Plaintiff had the residual functional capacity ("RFC") to "perform sedentary work as defined in 20 CFR 404.1567(a) except he requires the option to alternate between sitting and standing every forty-five minutes; he must avoid extreme temperatures, humidity, or environmental irritants; and he cannot climb ladders, ropes, or stairs on a regular basis." [*Id.*] At step four, the ALJ determined that Claywell was unable to perform any of his past work as a setup man, assembler, or sales clerk. [R. at 18-19.] At step five, the ALJ determined that a person of Plaintiff's age, education, work experience, and residual functional capacity could perform work as a cashier, hand bench worker, or hand packager. [R. at 19.] Because these jobs existed in significant numbers in the national economy, the ALJ concluded Plaintiff was not disabled. [*Id.*]

## Discussion

Plaintiff presents four arguments for remand of the ALJ's decision. He contends 1) that substantial evidence did not support the ALJ's decision that he was not disabled due to his anxiety, depression, morbid obesity, and knee pain [Dkt. 15 at 7]; 2) that the ALJ erred by not summoning a medical advisor to testify as to whether Plaintiff's combined impairments were equivalent to any Listed impairment [*id.* at 15]; 3) that the ALJ's credibility determination was patently erroneous [*id.* at 18]; and 4) that the ALJ erred by not addressing the "combined disabling result" of "all" of Plaintiff's alleged limitations. [*Id.* at 22.] The Court addresses the arguments in turn.

### A. Effect of Plaintiff's Anxiety, Depression, Morbid Obesity, and Knee Pain

Plaintiff's opening argument faults the ALJ for two reasons: 1) an "incomplete and erroneous" step three determination [Dkt. 15 at 7]; and 2) selective consideration of the medical evidence. [*Id.* at 8-13.]

### 1. The ALJ's Step Three Determination

Plaintiff contends the ALJ's "Step 3 determination was incomplete and erroneous because she never specified any Listed impairment under which she considered the claimant's combined impairments." [Dkt. 15 at 7; *see also* Dkt. 17 at 3.] Plaintiff specifically argues the ALJ should have considered "Listing 12.04 for his depression and anxiety." [Dkt. 15 at 7.]

Step three of the disability analysis requires the ALJ to determine whether the claimant's impairments meet or medically equal an impairment listed under 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Knox v. Astrue*, 572 F. Supp. 2d 926, 935 (N.D. Ill. 2008), *aff'd*, 327 F. App'x 652 (7th Cir. 2009). The claimant bears the burden of proving that his impairment or impairments meet such a listing. *Id.* (citing *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir.2006)). "An ALJ's failure to mention specific listings, if combined with a perfunctory analysis, may require a remand. On the other hand, an ALJ's failure to explicitly reference a relevant listing does not alone require reversal." *Id.* (internal quotations and citations omitted).

The ALJ's step three analysis in this case did not mention a specific listing and consisted of a single paragraph stating that "the claimant has not satisfied the narrow definition of a listed impairment . . . , nor do his impairments equal in severity a listed impairment." [R. at 15.] Standing alone, this sort of perfunctory analysis would likely require remand.

The Court, however, must read the ALJ's opinion as a whole. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004). Plaintiff argues that the ALJ should have considered Listing 12.04 to account for Plaintiff's depression and anxiety, but the ALJ explicitly considered these conditions in her step two analysis. [R. at 14.] There, the ALJ employed the specific analytical process set out in the Listing of Impairments for evaluating mental disorders. [*Id.*] This process requires consideration of four broad functional areas: activities of daily living; social

functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a. The ALJ in this case found that Plaintiff had only "mild" limitations related to daily living. [R. at 14.] As support, she cited the function reports from Plaintiff and his wife, [R. at 152, 165], and she specifically noted Plaintiff's ability to perform chores, attend school, and maintain personal care. [R. at 14.]

Next, she concluded Plaintiff had only "mild" limitations in social functioning. [*Id.*] Again, she cited evidence such as Plaintiff's ability to attend school, [*see, e.g.*, R. at 156], his ability to attend social functions such as car shows, [R. at 374], and his ability to work with people on a daily basis at the auto parts store. [R. at 14.] She likewise concluded Plaintiff had only "mild" limitations in his "concentration, persistence, or pace," as evidenced by his successful completion of his associate degree. [R. at 14.] Finally, the ALJ noted that the record was "devoid" of any evidence of decompensation. [*Id.*]

By conducting this analysis, the ALJ presented more than "perfunctory" consideration of Plaintiff's anxiety and depression. *See, e.g.*, *Rice*, 384 F.3d at 370 (approving of analysis where ALJ cited specific events and exhibits in support of conclusions). Further, the "broad functional areas" that the ALJ considered correspond to the requirements for establishing that Listing 12.04 applies. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The step two analysis thus provides a sufficient basis on which to affirm the ALJ's step three conclusion, and the ALJ's failure to specifically mention Listing 12.04 is not a basis for remand. *See Knox*, 572 F. Supp. 2d at 935; *see also Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *9 (N.D. Ill. Jan. 17, 2012) ("Given that the ALJ's finding at Step 2 is supported by the medical reports . . . , remand is not warranted on his omission of a more complete analysis of the issue at Step 3.").

Finally, the Court notes that Listing 12.04 is the only Listing that Plaintiff's briefs suggest the ALJ should have considered.[2] [*See* Dkts. 15 & 17.] Because the burden is on the claimant to show that his impairment meets or equals a listing, Plaintiff's failure to identity or argue the application of any other listing precludes remand on this basis. *See Knox*, 572 F. Supp. 2d at 935 ("Because Claimant has not established what, if any, listing applies in his case, he cannot show his impairments meet any listing.").

### 2. Selective Consideration of Medical Evidence

Plaintiff broadly argues that the ALJ selectively considered the evidence from Dr. Martin, [Dkt. 15 at 7], from Dr. McCoy, [*id.* at 8], from the Meridian Services mental health clinic, [*id.*], and from Dr. Davisson. [*Id.* at 9.] As Plaintiff notes, an "ALJ may not selectively consider medical reports, especially those of treating physicians." *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). Likewise, an "ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

The ALJ in this case, however, did not selectively consider the evidence. In evaluating Dr. Martin's report, the ALJ specifically noted that Plaintiff "endorsed severe knee pain, fatigue from sleep apnea, and atrial fibrillation," and that he had an abnormal gait. [R. at 16-17.] She also noted Dr. Martin's conclusion that Plaintiff "would have difficulty working" due to his obesity and knee pain. [R. at 17.] Thus, the ALJ was aware of and included in her decision the aspects of Dr. Martin's report that supported a finding of disability.

---

[2] During the hearing, Plaintiff's attorney also suggested that Listing 3.10 for sleep-related breathing disorders might apply, [R. at 29], but Plaintiff apparently abandoned this argument on appeal of the ALJ's decision. [*See* Dkts. 15 & 17.] Any argument related to Listing 3.10 is thus deemed waived. *See, e.g.*, *Scarberry v. Astrue*, No. 1:11-CV-00816-MJD, 2012 WL 3579916, at *7 (S.D. Ind. Aug. 17, 2012) (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) ("[U]ndeveloped and unsupported arguments are waived.")

Plaintiff then argues that the ALJ "arbitrarily rejected" Dr. Martin's conclusion about Plaintiff's ability to work. [Dkt. 15 at 8.] This is not true: The ALJ provided numerous reasons for granting Dr. Martin's opinion only "some weight," including 1) the lack of x-rays or other diagnostic findings supporting the alleged severity of Plaintiff's conditions; 2) Dr. Martin's own findings that Plaintiff had full strength and normal range of motion; 3) Plaintiff's lack of effort during the pulmonary assessment Dr. Martin ordered; and 4) Plaintiff's ability to work throughout the day at the auto parts store. [R. at 17.] By providing these reasons, the ALJ adequately supported her decision to reduce the weight of Dr. Martin's conclusion. *See* 20 C.F.R. § 404.1527(c) (directing ALJ to consider whether medical opinions are "consistent . . . with the record as a whole" and supported by evidence such as "medical signs and laboratory findings"); *see also Perry v. Astrue*, No. 1:11-CV-00108, 2011 WL 6141098, at *8 (N.D. Ind. Dec. 9, 2011) ("Of course, an ALJ is entitled to discount a medical source opinion when it is inconsistent with the other evidence of record.").

Next, the ALJ did not selectively consider the evidence from Dr. McCoy's report. Rather, the ALJ specifically noted that Plaintiff "endorsed depression and anxiety," and that Dr. McCoy opined that Plaintiff would have "some struggles" due to "chronic pain and associated irritability." [R. at 17.] Thus, the ALJ was plainly aware of the portions of the report that supported a finding of disability. Again, Plaintiff argues that the ALJ "arbitrarily rejected" the doctor's opinion, [Dkt. 15 at 8], and again, this is simply not true: the ALJ stated that she gave Dr. McCoy's opinion "little weight" because the evidence from Plaintiff's later experiences in both school and work settings did "not suggest the need" for restricting his RFC to the extent implied by Dr. McCoy's opinion. [R. at 17.] As with Dr. Martin's report, the ALJ's consideration of this conflicting evidence was entirely proper, *see* 20 C.F.R. § 404.1527(c), and

her explanation provides substantial evidence in support of her conclusions about Dr. McCoy's report. *See, e.g.*, *Reynolds v. Bowen*, 844 F.2d 451, 454 (7th Cir. 1988) (permitting ALJ to discount physician's report that conflicted with claimant's daily activities).

A similar analysis holds true for Plaintiff's allegation that the ALJ "selectively considered" and "arbitrarily rejected" the records and evaluations from Meridian Services mental clinic. [Dkt. 15 at 8-9.] In reality, the ALJ expressly noted the diagnoses of "depression and anxiety" and the assignment of a GAF score of 35. [R. at 17.] Plaintiff is correct that the ALJ omitted reference to some of Meridian's specific findings, such as Plaintiff's perceived need to be very private, [Dkt. 15 at 8-9], but an ALJ "is not required to address every piece of evidence or testimony." *Dixon*, 270 F.3d at 1176. Rather, she need only "provide some glimpse into her reasoning." *Id.*

Here, the ALJ complied with this requirement. She explained that the Meridian Services report was prepared by a "social worker rather than an acceptable medical source," and that Plaintiff stopped seeking specialized mental health treatment soon after beginning therapy. [R. at 18.] Both these factors were appropriate reasons to reduce the impact of the Meridian Services records in determining the severity of Plaintiff's restrictions. *See* SSR 06-03p (stating that information from sources such as social workers "cannot establish the existence of a medically determinable impairment"); [3] *Cook v. Astrue*, 800 F. Supp. 2d 897, 908-09 (N.D. Ill. 2011) (finding that gaps in treatment suggested condition was not as severe as alleged).

---

[3] Plaintiff argues in his reply brief that the ALJ was not entitled to reject the opinion of a social worker simply because the opinion did not come from an "acceptable medical source." [Dkt. 17 at 5.] Plaintiff cites 20 C.F.R. § 404.1513(d), and states that the ALJ was "required" to consider the social worker's opinion. [*Id.*] That regulation, however, states only that the SSA "may" use evidence from non-medical sources to evaluate the severity of a claimant's impairments. 20 C.F.R. § 404.1513(d). Moreover, the ALJ's opinion does not suggest that she "rejected" the social worker's opinion. [*See* R. at 17-18.] Rather, the source of the opinion was merely one factor among several that the ALJ considered in determining how much weight to give the opinion. [*See id.*]

Plaintiff also faults the ALJ's treatment of the GAF score of 35. As noted above, such a score is consistent with "some impairments in reality testing or communication," such as illogical or irrelevant speech, or "major impairments in several areas, such as work or school, family relations, judgment, thinking, or mood." [Dkt. 16 at 8 n.2.] Plaintiff contends such a score indicates "total disability." [Dkt. 15 at 10.]

The ALJ, however, explained that the record did not contain a "substantive explanation for such an extreme rating." [R. at 18.] Plaintiff, after all, had successfully completed his associate degree, [R. at 33], and had been working in a job that required him to deal with the general public on a constant basis. [R. at 42.] Furthermore, the social worker who assigned the score wrote that Plaintiff had a "logical" and "linear" thought process, [R. at 335], and liked being with his son. [R. at 338.] This evidence is not consistent with "major impairments" in areas such as "work," "school" or "family relations." Thus, the GAF score was not consistent with the record and was entitled to little weight.

Moreover, GAF scores are not determinative of an ALJ's analysis: these scores are used to plan treatment options; they do *not* assess functional capacity. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Thus, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Id.* (citation omitted). Plaintiff may therefore argue that a GAF score of 35 "prov[es] total disability," [Dkt. 15 at 11; *see also* Dkt. 17 at 4], but the law is simply not consistent with such a claim.

Plaintiff finally argues that the ALJ "selectively considered" the August 13, 2012 evaluation from Dr. Davisson because she "ignored that his diagnoses included: sleep apnea, paroxysmal atrial fibrillation, hypertension, asthma, depression, osteoarthritis in his back, hips,

and knees, and obesity." [Dkt. 15 at 9.] This argument is baseless. In discussing Dr. Davisson's treatment, the ALJ explicitly mentioned "diagnoses of benign hypertension, atrial fibrillation, and sleep apnea," and "osteoarthritis, asthma, and depression." [R. at 16.] She then considered later treatment records from Dr. Davisson and noted diagnoses of "depression, hypertension, atrial fibrillation, sleep apnea, and back pain." [R. at 18.] Finally, she specifically referred to the August 13, 2012 report and reproduced Dr. Davisson's ultimate opinion nearly verbatim, in writing "Dr. Davisson submitted a report listing the claimant's prognosis as fair and his work sustainability as moderated by obesity, arthritis, fatigue, and motivation." [R. at 18.] Plaintiff's statement that the ALJ "ignored" this report and "ignored" Plaintiff's diagnoses is therefore inexplicable and patently incorrect.

Further, Plaintiff has no basis for his claim that the ALJ "arbitrarily rejected" Dr. Davisson's opinion. [Dkt. 15 at 9.] Plaintiff contends both in his opening brief and his reply that Dr. Davisson stated Plaintiff "would have difficulty sustaining an 8 hour work day due to his obesity, arthritis, fatigue and motivation," [Dkt. 15 at 4; *see also* Dkt. 17 at 4], a finding Plaintiff later alleges "indicat[es] total disability." [Dkt. at 15.] In reality, Dr. Davisson wrote only that Plaintiff's ability to work would be "moderated" by these conditions. [R. at 416.] Next, rather than rejecting this opinion, the ALJ largely accepted it: the ALJ moderated Plaintiff's ability to work by restricting him to "sedentary work with the option to alternate between sitting and standing every forty-five minutes, with no climbing" of stairs or ladders. [R. at 17.] The ALJ imposed these restrictions specifically to account for Plaintiff's "pain," "fatigue," and "immobility," neatly aligning with Dr. Davisson's opinion that his ability to work would be moderated by obesity, arthritis, fatigue, and motivation. Thus, even if the ALJ gave Dr.

Davisson's opinion only "little weight," [R. at 18], it strains credulity to claim the ALJ "rejected" Davison's opinion.[4]

Finally, to the extent that the ALJ *did* discount Dr. Davisson's opinion, she adequately explained her decision to do so. Contrary to Plaintiff's claim of "arbitrary" rejection, the ALJ explained that the "claimant's actual functioning, in light of the objective evidence," was more consistent with the ALJ's RFC than it was with Dr. Davisson's opinion. [R. at 18.] Granted, the ALJ did not repeat her earlier analysis of Plaintiff's activities, [*see, e.g.*, R. at 16 (noting and providing examples from a "record filled with activities inconsistent with the claimant's allegations")], but an ALJ is not required to engage in such repetitive analysis. *See, e.g.*, *Rice*, F.3d 3 at 370 n.5. Thus, substantial evidence supports any deviation from Dr. Davisson's opinion, and Plaintiff's argument does not require remand.

**B. Failure to Summon Medical Expert**

Plaintiff next argues that this Court must remand the ALJ's decision because the ALJ did not "summon a medical advisor to testify whether the claimant's combined impairments were medically equivalent to any Listed Impairment, such as Listing 12.04." [Dkt. 15 at 15.] The Commissioner responds that the ALJ did not need the assistance of a medical expert to determine Plaintiff's disability status, and that ALJs have wide discretion in deciding whether to consult an expert. [Dkt. 16 at 13.] In reply, Plaintiff contends that Dr. Davisson's 2012 findings of osteoarthritis and back pain required an updated medical opinion to assess evidence that was not before the state agency's reviewing physicians. [Dkt. 17 at 6.]

---

[4] Plaintiff also claims the ALJ "play[ed] doctor" by discounting the reports from Dr. Martin, Dr. McCoy, Meridian Health Services, and Dr. Davisson. [Dkt. 17 at 4.] An ALJ, however, "play[s] doctor" when she "fail[s] to address relevant evidence." *Dixon*, 270 F.3d at 1177. As explained above, the ALJ in this case addressed the relevant evidence and explained why she found each of the reports entitled to "little" or "some" weight. Thus, she did not "play doctor." *See id.* ("Here, ALJ Kelly thoroughly discussed the medical evidence in making her decision: she did not, as [plaintiff] suggests, play doctor.").

"Under SSR 96–6p, 'an administrative law judge . . . must obtain an updated medical opinion from a medical expert . . . [w]hen additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.'" *Cirelli v. Astrue*, 751 F. Supp. 2d 991, 1004 (N.D. Ill. 2010) (quoting SSR 96–6p).

Plaintiff in this case focuses on the 2012 examinations in which Dr. Davisson noted "osteoarthritis" and "back pain." [Dkt. 17 at 6; R. at 446-48, 454-55.] The results of these examinations necessarily were not before the state agency physicians when they reviewed Plaintiff's records in 2011. Those physicians, however, did have records related to Dr. Victoria Martin's consultative exam. [*See* R. at 309.] In that exam, Dr. Martin noted that Plaintiff had been diagnosed with osteoarthritis, [R. at 273], and complained of back pain. [R. at 274.] Thus, the allegedly new evidence that required the opinion of a medical expert was not new at all: instead, the Plaintiff's osteoarthritis and back pain were part of the record considered by the reviewing physicians, and the ALJ had no need to summon a medical expert to opine on these conditions. *See, e.g.*, *Cirelli*, 751 F. Supp. 2d at 1003-04.

Plaintiff also contends that a medical expert was necessary because the state agency reviewing doctors did not consider the August 13, 2012 "functional evaluation by the claimant's treating physician, Dr. Davisson, indicating total disability." [Dkt. 15 at 15.] Plaintiff's characterization of Dr. Davisson's August 12 report is at best nonsensical and at worst an outright misrepresentation. The report stated only that Plaintiff's ability to work an 8-hour day would be moderated by his fatigue, obesity, arthritis, and motivation. [R. at 416.] It did *not* indicate he was totally disabled. Plaintiff thus has no basis for his claim that the state agency

reviewing experts "presumably . . . would have reasonably determined the claimant was totally disabled" had they seen the report. [Dkt. 15 at 15.]

Finally, the Court notes that the ALJ has broad discretion in deciding whether to request a supplemental medical opinion. *Cole v. Colvin*, No. 1:13-CV-01368-SEB-TAB, 2014 WL 4415998, at \*5 (S.D. Ind. Sept. 8, 2014). Indeed, SSR 96-6p directs that consultation with a medical expert is necessary only when, "*in the opinion of the administrative law judge*," newly received evidence might have changed the state agency doctors' opinions. SSR 96-6p (emphasis added). The Court will thus "defer to the ALJ's judgment" unless there is a "showing that the ALJ disregarded relevant medical evidence contrary to her conclusions or failed to adequately explain how she reached her decisions." *Cole*, 2014 WL 4415998, at \*5. As noted above, the ALJ in this case properly considered the record as a whole and did not selectively consider only the evidence supporting her determination. Thus, the Court will defer to the ALJ's decision not to summon a medical advisor.

### C. The ALJ's Credibility Determination

Plaintiff contends that the ALJ's "credibility determination is patently erroneous" because the ALJ did not explain why the objective medical evidence did not support the claimant's assertion of disabling pain. [Dkt. 15 at 18.] He specifically attacks the ALJ's boilerplate credibility determination, in which the ALJ stated "the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged systems; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity." [*Id.* at 19.] Plaintiff argues this sort of analysis is "perfunctory" and "backwards." [*Id.* at 19-20.]

"An ALJ's credibility determination may be overturned only if it is 'patently wrong.' However, an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record. A failure to do so could also be grounds for reversal." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citations omitted).

Weighed against this standard, Plaintiff's contentions are unavailing. First, the ALJ *did* explain why the objective evidence did not support Plaintiff's complaints of disabling symptoms. She noted, for instance, that the record is "filled with reports of activities inconsistent with the claimant's allegations," including 1) working a job that required him to stand for several hours despite claims that he could stand for no more than a few minutes;[5] 2) obtaining his associate degree for medical assisting despite claims that he had trouble concentrating; and 3) collecting unemployment benefits despite claims that he was disabled. [R. at 16.] She also specifically noted that "the record does not contain any x-ray images or other similar testing to evaluate the severity" of the osteoarthritis that produced Plaintiff's allegedly disabling pain. [R. at 17.] Thus, the ALJ provided the sort of "specific reasons," *Pepper*, 712 F.3d at 367, that support finding a claimant not credible.

Next, the ALJ's use of boilerplate language is not itself fatal to her credibility determination. *Id.* ("[T]he simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion[.]") As long as the ALJ also "points to information that justifies his credibility determination," a court will uphold the ALJ's conclusion. *Id.*

---

[5] Plaintiff argues in his reply brief that it was improper to consider Plaintiff's recent work history at the auto parts store because the ALJ determined that Plaintiff had not yet recorded "earnings at the requisite level of substantial gainful activity." [Dkt. 17 at 9.] This argument is incomprehensible: Plaintiff's demonstrated ability to perform certain tasks despite his claims that he cannot perform those tasks undermines his credibility, regardless of the particular earnings from those activities.

Here, the ALJ did just that: as described above, she noted the various activities in which Plaintiff engaged despite his claims of symptoms that would have limited such activities. [R. at 16.] The ALJ also observed that "claimant's treatment has been largely conservative and effective in mitigating his symptoms," [*id.*], an observation that is consistent with other ALJs' determinations that a plaintiff's claims are not credible. *See, e.g.*, *Pepper*, 712 F.3d at 368 (approving ALJ's discussion of claimant's control of symptoms with medication and physical therapy).[6] Hence, even if the ALJ in this case used boilerplate language, she also provided enough analysis of the Plaintiff's credibility that the Court need not reverse her opinion.

Finally, the ALJ's credibility determination was not "backwards." [Dkt. 15 at 19.] Plaintiff correctly notes that an ALJ should not determine a claimant's RFC and then use that RFC to assess the claimant's credibility. [*Id.* (citing *Shauger v. Astrue*, 765 F.3d 690, 696 (7th Cir. 2012).] The ALJ in this case, however, determined Plaintiff's credibility without regard to her later RFC analysis: She first noted Plaintiff's "conservative treatment" and control of symptoms with medication. [R. at 16.] She then noted Plaintiff's ability to work a job that required him to stand for long periods and his ability to concentrate in school. [*Id.*] Finally, she noted the inconsistency between alleging an ability to work (when collecting unemployment) and an inability to work (when pursuing disability benefits).[7] [*Id.*]

---

[6] Before drawing a negative inference based on lack of treatment, the ALJ should allow the claimant to explain any gaps in treatment. *See* SSR 96–7p. Plaintiff, however, has not suggested alternative explanations for his lack of treatment, [*see* Dkt. 15], and Plaintiff's consistent access to medical care suggests any lack of treatment for his impairments was the result of well-controlled symptoms, rather than lack of access to care. Thus, even if the ALJ should have explored the reasons for any lack of treatment, the Court does not find this deficiency warrants remand. *See, e.g.*, *Cook*, 800 F. Supp. 2d at 908-09 (stating that court would not remand for ALJ to address hypothetical explanations for lack of treatment).

[7] Plaintiff contends the ALJ erred in considering Plaintiff's receipt of unemployment benefits. [Dkt. 17 at 8.] The Seventh Circuit, however, has noted that this factor may play a role in credibility determinations. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). Also, as described above, the ALJ gave other reasons for discounting Plaintiff's testimony, such that any error in considering Plaintiff's unemployment benefits was harmless.

The ALJ's reasons for discounting Plaintiff's testimony were thus independent of her RFC analysis. The ALJ did *not* argue that Plaintiff was not credible because his statements were inconsistent with his RFC; instead, the ALJ simply concluded that Plaintiff's statements were not consistent with his history of treatment or his willingness and ability to work. This did not get the analysis "backwards;" rather, this analysis was entirely appropriate. *See Pepper*, 712 F.3d 368 (upholding credibility determination based on inconsistency between claimant's testimony and evidence of claimant's activities); *see also id* at 369 ("[T]he amount of daily activities [plaintiff] performed [and] the level of exertion necessary to engage in those types of activities . . . are exactly the type of factors the ALJ was required to consider."). Hence, the Court will not disturb the ALJ's credibility determination, and Plaintiff's argument presents no basis for remand.

### D. "Combined Disabling Result" of Plaintiff's Limitations

Plaintiff finally argues that the ALJ's RFC did not "account for the combined disabling result of his quite severe mental illness and his inability to stand for 2 hours or to complete and [sic] 8 hour day due to his obesity and knee pain." [Dkt. 15 at 22.]

Plaintiff is correct that the ALJ must consider "in concert" all "limitations that arise from medically determinable impairments." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). This requirement, however, does not mandate exhaustive analysis. "As long as the ALJ discusses each symptom," the Seventh Circuit requires "only that the ALJ acknowledge having considered the aggregate effect." *Lott v. Colvin*, 541 F. App'x 702, 706 (7th Cir. 2013), *as amended* (Oct. 17, 2013). Thus, the court in *Lott* found it sufficient that the ALJ described each impairment, stated "that she examined the 'combination of impairments' at step two," and "'considered all symptoms' at step four.'" *Id.*

The ALJ in this case provided similar analysis. First, she described the particular findings that Plaintiff contends the ALJ should have combined to find a disabling impairment. [*See* R. at 14, 17 (discussing psychological symptoms and Dr. McCoy's report); R. at 17 (noting alleged difficulty walking for two hours in an eight-hour workday); R. at 18 (discussing Dr. Davisson's report of symptoms moderating ability to work eight hours).] Second, the ALJ stated that the claimant did not have an "impairment or *combination of impairments*" that met or medically equaled a Listed impairment. [R. at 15 (emphasis added).] Finally, the ALJ noted that she was required in the RFC analysis to "consider *all* of the claimant's impairments," and that she had in fact "considered *all* symptoms." [R. at 13, 15 (emphasis added).]

The ALJ's decision thus shows that she was aware of the impairments that allegedly combined to produce a disabling impairment, and that she considered those impairments in combination. Hence, Plaintiff has not provided a valid basis for remand. *Lott*, 541 F. App'x at 706; *see also Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (upholding ALJ who stated that he considered whether impairments were severe enough "either singly or in combination" to equal a Listed impairment); *Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007) (upholding ALJ whose opinion stated "claimant does not have an impairment, or combination of impairments," that resulted in disability).

Furthermore, the ALJ explicitly stated that she imposed limitations on Plaintiff's RFC that "adequately account for his pain, fatigue, immobility, and any difficulties breathing," [R. at 17], indicating that she contemplated the combined effect of Plaintiff's physical ailments. At the hearing, the ALJ then asked the vocational expert whether jobs would be available to the Plaintiff if the ALJ added the additional limitation of "avoid[ing] face to face interaction with the general public." [R. at 48.] The ALJ thus considered the combined impact of Plaintiff's physical

and mental impairments, and the vocational expert's testimony that Plaintiff would still be able to perform certain jobs, [*id.*], constitutes substantial evidence supporting the ALJ's determination that Plaintiff was not disabled. *See, e.g.*, *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993) (finding answers to hypotheticals constitute substantial evidence as long as limitations in hypothetical are supported by medical evidence). As with Plaintiff's other arguments, then, the Court finds no basis for reversing the ALJ's decision, and the ALJ's conclusion should be upheld.

## Conclusion

For the foregoing reasons, the Court finds that substantial evidence supports the ALJ's decision that Claywell is not disabled. The Magistrate Judge therefore recommends that the Commissioner's decision be **AFFIRMED**. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date: 11/17/2014

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov